STATE, Respondent, vs. DeHART, Appellant.

*February 12—March 9, 1943.*

564

For the appellant there was a brief by *O'Melia & Kaye* of Rhinelander, and oral argument by *Walter F. Kaye*.

For the respondent there was a brief by the *Attorney General* and *William A. Platz,* assistant attorney general, and oral argument by *Mr. Platz.*

WICKHEM, J.    On or about November 6, 1935, an abandoned lumbering shack in the town of Schoepke, Oneida county, Wisconsin, burned down.    The sheriff investigated and discovered in the ruins the badly burned torso of a human being, the head and lower extremities being missing.    Later fragments of skull and other bones were discovered.    The body was buried and there was no further investigation at that time.    About six years later, defendant was in the Forest county jail awaiting trial on a charge of misdemeanor.    The sheriff and district attorney of Oneida county communicated with him there, and accused him of participation in the death of the person whose remains had been found in the lumber

shack. On June 9, 1941, defendant agreed to submit to a lie-detector test by the Chicago police department, and to accompany the sheriff and district attorney to Chicago for that purpose. Defendant was taken to Chicago, lodged in jail over night, and on the next morning had the lie-detector test administered to him by a member of the Chicago police department. At the conclusion of this test, the results of which were not disclosed to the court or jury, defendant made and signed a confession. The substance of this confession is as follows: Defendant had been staying with Clif Flannery, son of Wade Flannery. On the day before the murder, Wade Flannery told "about how we could rob that fellow of all kinds of money. Ten thousand dollars, I think he said." In reply to defendant's question as to who the fellow was, Flannery replied, "some old bachelor" who lived close to Flannery's place. Defendant was drunk the next day and while in this condition Wade Flannery persuaded him to go with him to rob the old man. He and Flannery went to the shack and Flannery shot the old man, took his money and gave defendant about $100 of it. Upon sobering up defendant got scared and destroyed the money. Defendant was not inside when Flannery did the shooting but he stayed outside to keep watch. He did shoot the lock off the cabin door, but did not believe he had hit the old man. If he did, he did not intend to. After he destroyed the money he left for Indiana, Kentucky, and Florida. No threats or promises were made to induce the confession and he had not been mistreated. The evidence furnished by the confession obviously established the *corpus delicti*, as well as defendant's guilt, and we shall not labor the point. While, without the confession, defendant would doubtless have been entitled to a directed verdict, evidence as to the location and condition of the body, and expert testimony that the condition of the bones was consistent with buckshot wounds inflicted at close range, sufficiently corroborated the confession.

Defendant's first contention is that the confession was not voluntary. The record discloses that there was no objection to its admission into evidence, nor any request for an examination by the court as to its voluntary character, preliminary to a ruling upon its admissibility. The confession came into evidence without objection, and was submitted to the jury with proper instructions concerning the requirement that it be voluntary in character. We shall not pass upon any procedural questions arising out of this situation because we consider that the jury was entitled upon the evidence to conclude that there were no circumstances adversely affecting the credibility of the confession. The district attorney and sheriff who were present at all times during the period before the confession was made deny any violence, mistreatment, promises, or any other disqualifying circumstances during the trip to Chicago or the stay in Chicago. There is some evidence from which it could be concluded that Mr. Reed, who gave the lie-detector test, used profane language in urging the defendant to tell the truth. Some of this is denied by Mr. Reed, but in any event, there is nothing to show that his conversation with defendant was coercive in manner or content. Defendant intimates that he was strapped down during the lie-detector test, but there is evidence from which the jury could believe that the only straps that were attached to him were the ordinary appliances of the lie detector.

There is an intimation in defendant's brief that the sequence of events was such as to leave the impression that the lie-detector test had demonstrated defendant's guilt and that this circumstance actuated his confession. The record does not warrant this intimation, but if it did, the point would not be material since it would not bear upon the voluntary character of the confession. Such an impression would not be prejudicial to defendant. The thing that was prejudicial to defendant was the confession which is many times more conclusive than any implication that could be drawn from the fact of the

lie-detector test. The jury was entitled to conclude that the confession was trustworthy and believable.

Aside from the confession, there were corroborating admissions. It was testified by the sheriff of Oneida county that after making the written confession defendant said he felt much relieved; that he wished he had done this before he got married; that he was sorry he made the sheriff take the trip to Chicago. The district attorney testified that before leaving the Chicago police station, defendant said that he was glad he told this; that he hadn't had a good night's sleep in years, and that he had intended writing from Florida to let them know about it.. There was evidence that at the Rhinelander jail defendant was visited by his brother, Glen, while the district attorney was present, and that Glen asked defendant what he was doing in jail and defendant said, "I got mixed up in a shooting affair with Wade Flannery back a few years." When he was arraigned on June 12, 1941, defendant stated, in response to the usual question by the court whether he was guilty or not guilty, "Well, I am guilty of being with the man." The wife of defendant testified when she saw defendant in jail after he was charged with murder he told her that he was with Flannery and everything was true except he was drunk and did not know what he was doing about it. This testimony strongly evidences reliability of the confession.

We now proceed to a consideration of the errors assigned by defendant. The first is that defendant was materially prejudiced by being charged in the final complaint with murder in the first degree, when both the initial complaint and the judge's charge to the jury assumed that one who had never been brought to trial was the murderer and that defendant was charged as an aider and abettor. In other words, it is claimed that defendant should have been informed against as an aider and abettor under sec. 353.05, Stats., and the case submitted to the jury on this basis. Since the crime of aiding

and abetting carries the same penalty as that of the principal crime, and the evidence actually warranted prosecution of defendant as principal, we have difficulty in understanding the force of this contention. It appears to be the view of defendant that it would be of advantage to him to be charged with aiding and abetting Flannery who was supposed to have actually done the killing, because Flannery could not be convicted upon defendant's confession. This is not true for two reasons: (1) Conviction of the principal is not a condition to holding the accessory, *State v. Hess,* 233 Wis. 4, 288 N. W. 275; (2) defendant's confession is sufficient to convict him, and the state's difficulties of proof with respect to his principal are not matters of concern to him.

It is next contended that defendant was prejudiced by the introduction into evidence of the records of two previous convictions of crime, of two mere accusations, and by an imputation of immorality which was wholly unestablished; that all of these matters were unrelated to the crime with which defendant was charged and were highly prejudicial to him. We shall dispose of these matters *seriatim.*

Defendant put into evidence the fact of his conviction on September 25, 1930, of taking an automobile. Admission of the evidence of conviction was, of course, proper as affecting the credibility of defendant, and in any event, it was put in evidence by defendant and not by the prosecution. The complaint goes to the later introduction of the record in the case for the sole purpose of establishing the date of the conviction. The charge of stealing tires was introduced by the defense to support the defense of alibi, it being contended that defendant fled from this charge prior to the time when the murder was committed, and was out of the state at the time of the murder. The record concerning this charge was introduced to show the date when the warrant was issued. The record also showed that the charge was dismissed on March 26, 1936, and this date was important because de-

fendant testified that he wanted to stay out of the state until the charge would outlaw and this date had a tendency to rebut his testimony. The charge of carrying concealed weapons made òn January 19, 1930, and that of burglary of a railroad car on December 5, 1929, were offered for the purpose of showing that defendant had previously been charged with crimes quite as serious as that of stealing automobile parts but had not found it necessary to flee the state on those occasions. All these matters were admissible for the limited purpose for which they were offered and it is doubtful whether any prejudice resulted in view of the evidence of previous convictions put in by defendant himself. In no instance did the testimony offered go into any details concerning the offenses, or, indeed, go beyond the necessities of the issues to which the evidence was addressed.

It is also complained that the district attorney, by questions · to defendant, imputed that the latter had gone to Kentucky with a woman not his wife. The state's brief intimates that these were asked as a foundation for impeachment and had a bearing upon the question of how many times defendant had gone to Kentucky. For some reason that does not appear they were never followed up. There was no objection to them and so far as we can discover there was no motion to strike. Such evidence should not be put in by the district attorney unless he proposes to follow it up with evidence establishing its relevance. In view of defendant's confession and evidence properly admitted as to the offenses of defendant, however, we cannot believe that this would have been prejudicial, even if it had come in over objection, which it did not.

Defendant claims that the details of the lie-detector test were disclosed to the jury contrary to the doctrine of the case of *State v. Bohner*, 210 Wis. 651, 246 N. W. 314. The record discloses that neither the questions involved in the test, defendant's answers, nor his reactions as registered by

the polygraph were gone into by counsel. There was some questioning as to the general accuracy of the machine in disclosing that questions had been falsely answered. This subject was opened by defendant's counsel and thereafter pursued for a short period by the prosecuting attorney. No harm was done defendant, and further than this, defendant is in no position to object. At most, the evidence was inconclusive and a waste of the court's time.

We now come to certain instructions of the trial court to which objection is made by defendant. Objection is made to an alleged instruction that it appeared without dispute that deceased was murdered. A careful examination of the instructions does not substantiate this claim. What the court said was that it appears without dispute that the shack was destroyed and that thereafter the charred remains of a human being were found among the ashes; that a human being was in the building at the time of the fire; that the body was burned in the fire; that the state had offered proof to support its claim that the body was that of the occupant of the building; that he was murdered by one Wade Flannery and the defendant prior to the burning of the building by them and while they were engaged in robbing him. We see no error in this. The opening statement of the defendant's attorney was as follows:

"The district attorney has told you that a man lived in the town of Schoepke. That, Herman DeHart doesn't deny. That he was found dead in the town of Schoepke and his shack was burned; that that man was known to have money in his possession, all of which isn't denied. Nor does the defense deny that Herman DeHart was acquainted with Wade Flannery, or any of the other Flannerys; nor does he deny that he went hunting with the Flannerys; nor does he deny that he was in the vicinity of Pelican lake in the fall of 1935. But that is all going to be by us admitted. At that time he was hiding out from a warrant that had been issued from Forest county. We are going to admit that and tell you why he was hiding out,—for stealing two tires prior to his going to Clifford Flannery."

From the foregoing we conclude: (1) That the court did not err in instructing that it is without dispute that deceased was murdered; and (2) that the instruction was in accordance with the admissions in the opening statement.

It is also claimed that the court did not instruct the jury that the guilt of Wade Flannery must be proved beyond a reasonable doubt. In the first part of its instructions the court stated in the conventional and usual form for such instructions that the "burden rests upon the state to prove that he [defendant] is guilty . . . beyond all reasonable doubt." Later, the court stated "the burden rests upon the state to prove that this human being met his death at the hands of the defendant or at the hands of Wade Flannery while he and the defendant were engaged in a joint enterprise." Having already instructed the jury that the burden of proof is upon the state to convict defendant beyond a reasonable doubt, it would not be necessary to repeat the instruction as to the standard of proof each time the burden was thereafter mentioned. It is clear from the instruction as a whole that every element of the crime must be established beyond reasonable doubt. The state's whole case was to the effect that there was concert of action between Flannery and defendant. If the elaborate instructions on reasonable doubt did not apply to this, there was nothing for them to apply to. The jury could not find defendant guilty beyond a reasonable doubt without being convinced to the same degree of Flannery's participation.

It is complained that conspiracy was not specifically defined, but there was no request for such instruction, and under the circumstances of this case no prejudice could result from its omission in any event.

It is contended that the trial court should have charged the jury that Flannery could not have been convicted upon the mere confession of an accomplice. The point is immaterial, since Flannery was not on trial. Assuming that Flannery could not be convicted solely on the basis of defendant's con-

fession, that is no obstacle to defendant's conviction upon his own confession.

It is contended that the jury disregarded alibi testimony that was wholly unimpeached. That is not true. The alibi testimony was confused and inconsistent and the jury was not bound to believe it. The witnesses to substantiate it were related to the defendant and could very easily have been mistrusted by the jury. The alibi consisted of a claim that defendant was in Kentucky at the time of the killing, having fled there to escape arrest for stealing automobile tires. He claims to have arrived in Sandy Hook, Kentucky, on the 23d or 24th of October, 1935, and to have stayed in Kentucky until March, 1936, when he went to Florida and remained several years. There was testimony by one of the Kentucky witnesses that he gave a check to defendant at Sandy Hook, Kentucky, and sent him to buy some wheat. The check was dated October 10, 1935, and was paid by the bank on October 16, 1935, a week before defendant claims to have been in Kentucky, and two days before Clifford Flannery positively places the defendant at his home near Pelican lake. Flannery testified that on October 18th he collected bounty for two coyotes, that he and defendant had caught that day. Defendant did not assert an alibi until about three weeks before the trial and claimed that the delay was due to ignorance as to when the murder was committed. On cross-examination defendant testified that he knew the date of the murder when first arrested. On cross-examination he further testified that he never told Mr. Reed, operator of the lie detector, that he could not have committed the crime, because he was in Kentucky *at the time,* but on direct examination he had testified that he told Reed it was impossible for him to "be there *at this time."* The foregoing amply justified the jury in rejecting the alibi. In any event, the confession contradicted it, and belief in the truth of the confession would necessarily compel rejection of the alibi.

It is objected that there was a breach of the proprieties because Mr. Richards, district attorney of Oneida county, who with the sheriff had accompanied the defendant to Chicago for the lie-detector examination, and was familiar with the circumstances under which the confession was elicited, testified in this action. It appears from the record, however, that Mr. Richards withdrew from the prosecution of the case. Mr. L. F. Schmitt of Merrill was appointed special district attorney and conducted the prosecution. This is fully in accordance with the ethical standards of the American Bar Association and conforms to the proper course of conduct as laid down by this court in *Zeidler v. State,* 189 Wis. 44, 206 N. W. 872.

We are of the view that defendant has had a fair trial, that he was competently defended, that his confession could be found by the jury to have been voluntary in character, and on the basis of it, that the jury could find him guilty beyond a reasonable doubt. It follows that the judgment of conviction must be affirmed.

*By the Court.*—Judgment affirmed.